UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
BONELL PRODUCE CO. INC D/B/A DUBLIN
PRODUCE, INC.,

**MEMORANDUM AND ORDER**
Case No. 08-CV-4218 (FB) (CLP)

Plaintiffs,

-against-

CHLOE FOODS, INC., BRF ACQUISITION
LLC, CHLOE KONTOGIANNIS, ANDREW
THEMIS, ANNETTE APERGIS, AMERIVON
HOLDINGS LLC, SCOTT DE RUYTER and
BRUCE ZEEDICH,

Defendants.
------------------------------------------------------------x

*Appearances*
*For Plaintiff:*
MARK C.H. MANDELL, ESQ.
42 Herman Thau Road
Annandale, NJ 08801

CRAIG A. STOKES, ESQ.
3330 Oakwell Court, Ste. 225
San Antonio, TX 78218

*For Defendants Amerivon Holdings and Scott De Ruyter:*
WILLIAM J. TINSLEY, Jr., ESQ.
Sillis Cummis Epstein & Gross
One Rockefeller Plaza
New York, NY 10020

*For Defendants Chloe Foods, Inc. and BRF Acquisition LLC:*
BRUCE MINKOFF, ESQ.
Robinowitz Cohlan Dubrow & Doherty, LLP
199 Main Street
White Plains, NY 10601

**BLOCK, Senior District Judge:**

Plaintiff Bonell Produce Co., Inc., doing business as Dublin Produce, Inc. ("Dublin"), applies for a preliminary injunction preventing Chloe Foods, Inc. ("Chloe") from transferring funds to any creditors other than Dublin, since it claims to be the beneficiary of a trust created under the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C.

1

§§ 499a-499t. At the heart of the parties' dispute is whether Dublin and Chloe entered into an agreement regarding the payment terms for the monies owed to Dublin for the purchases by Chloe of perishable goods that would constitute a waiver of PACA trust protection for Dublin. The Court finds that no such agreement was made; therefore, preliminary injunctive relief is granted.

I

The Complaint alleges that Chloe owes Dublin $1,198,712.40 for produce Dublin delivered to Chloe. By order to show cause dated November 5, 2008, Dublin sought a temporary restraining order and preliminary injunction to enjoin Chloe from transferring to any party other than Dublin any assets that constituted proceeds from produce Dublin delivered to Chloe.[1] The Court set a return date of November 7, 2008, at which time the parties agreed that Chloe would not transfer any "material assets" pending the Court's hearing and decision on the preliminary injunction application. *See* Tr. of Nov. 7, 2008 Hrg. at 22-23. The hearing took place on November 14, 2008.

Prior to the hearing, the parties submitted evidence establishing the following uncontroverted facts: Dublin and Chloe had a long-term business relationship, ended by the dispute that led to this action, in which Dublin made daily deliveries of potatoes that Chloe would use in its production of food products, such as packaged potato salad. Dublin's deliveries daily amounted to tens of thousands of dollars' worth of produce. Each of the invoices accompanying these deliveries contained the notice required for the creation and

---

[1] Dublin also sought *ex parte* relief, which the Court denied.

preservation of a PACA trust. *See, e.g.,* Schwartz Aff. Ex. 1.[2] Dublin and Chloe's course of dealing allowed Chloe to "slow pay," meaning Chloe did not pay immediately upon delivery. *See* de Ruyter Decl. ¶ 4.

At the hearing, testimony was elicited from Scott de Ruyter ("de Ruyter"), interim CEO of Chloe; Melvin Schwartz ('Schwartz"), president of Dublin; and Raymond Geer ("Geer"), Chloe's Chief Operating Officer. Sometime in May of 2008, there was a meeting between de Ruyter and Schwartz to discuss payment of the approximately $600,000 that Chloe then owed Dublin, and the future relationship of the companies. De Ruyter testified in a manner consistent with his previously submitted declaration, in which he stated that the outcome of the meeting was that:

> Schwartz agreed to continue shipping product to Chloe Foods if Chloe Foods would pay down its old debt in an approximate amount parallel to the charges incurred for new shipments. In other words and by example, if Dublin Produce shipped $50,000 of produce, Chloe Foods would attempt to pay approximately $50,000 towards its outstanding debt . . . .

De Ruyter Decl. ¶ 4.

Schwartz testified, on the contrary, that the agreement was that Dublin could

---

[2] The required language is:
> The perishable agricultural commodities listed on this invoice are sold subject to the statutory trust authorized by Section 5(c) of the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499e(c)). The seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received.

7 U.S.C. § 499e(c)(4).

3

expect to be paid for new shipments immediately: "I submit the bill and the next day I would be paid." *Id.* at 34. Schwartz said that Chloe was expecting a large infusion of cash and that the understanding was that "as soon as the infusion of money came in . . . [Chloe] would catch me up to date and we would be right on the target under the P.A.C.A. regulations." *Id.* The testimony of Raymond Geer, who was also at the May meeting, supports Schwartz's version of what was agreed upon: Geer said "the outcome [of the meeting] was that . . . from that date on . . . whatever was brought in as an order would be paid basically as a COD." *Id.* at 58. When asked whether there was "any specific agreement between Mr. de Ruyter and Mt. Schwartz to exten[d] the time for Chloe to pay for the produce," Geer answered "no." *Id.* at 59. Geer also said that the existing debt was to be repaid "in the very near future [after the expected] infusion" of cash into Chloe. *Id.*

Subsequent to the November 14 hearing, the parties submitted documents showing that the balance of Dublin's shipments less Chloe's payments since the May meeting is $426,700.62. Added to the debt existing before May of approximately $600,000, *see* Tr. of Nov. 14, 2008 Hrg. at 38; de Ruyter Decl. ¶ 12, this figure accords with the debt of approximately $1.2 million alleged in the Complaint.

The Court finds that the agreement entered into at the May meeting was as described by Schwartz: there was no agreement to new payment terms for the existing debt, and Dublin expected immediate payment on new deliveries.

# II

## A. The PACA Trust

"[A] PACA trust is automatically established each time a broker or merchant purchases perishable commodities upon credit . . . ." *D.M. Rothman & Co. v. Korea Comm. Bank of N.Y.*, 411 F.3d 90, 96 (2d Cir. 2005); *Driscoll Potatoes, Inc. v. Robinson Potato Supply Co. of Kansas City*, 1. F. Supp. 2d 1268, 1272 ("[T]here is a presumption that agricultural commodity purchasers hold a continuous PACA trust fund for the benefit of suppliers."). The trust mechanism in PACA is intended to protect sellers of perishable goods by making "the sellers' interests in the commodities and sales proceeds superior to those of the buyers' creditors, including secured creditors." *Am. Banana Co. v. Rep. Nat'l Bank of N.Y.*, 362 F.3d 33, 37 (2d Cir. 2004). In order to establish a PACA trust, sellers must give timely notice of the intent to preserve PACA trust rights. This can be done with notice printed on the invoice accompanying the produce. *See* 7 C.F.R. § 46.46(f)(3). Once sellers have gained the protection of a PACA trust, they will "remain beneficiaries until they are paid in full." 7 C.F.R. § 46.46(c)(1).

"[A] PACA trust in effect imposes liability on a trustee . . . who uses the trust assets for any purpose other than repayment of the supplier. This includes use of the proceeds from the sale of perishables for legitimate business expenditures, such as the payment of rent, payroll, or utilities." *Morris Okun, Inc. v. Harry Zimmerman, Inc.*, 814 F. Supp. 346, 348 (S.D.N.Y. 1993). Department of Agriculture regulations pursuant to PACA require PACA trustees "to maintain trust assets in a manner that such assets are freely

available to satisfy outstanding obligations to sellers . . . ." 7 C.F.R. § 46.46(d)(1).

## B. Waiver of PACA Trust Protection

A default payment period is provided by the regulations; for produce purchased by a buyer, payment must be made "within 10 days after the day on which the produce is accepted." 7 C.F.R. § 46.2(aa)(5).[3] The regulations also allow parties to agree to other payment periods, "Provided, That the party claiming the existence of such an agreement for time of payment shall have the burden of proving it." 7 C.F.R. § 46.2(aa)(11).

It is possible for a seller who has otherwise complied with the requirements for PACA trust protection to waive that protection: "Sellers who offer payment periods of longer than thirty days are not entitled to PACA trust protection." *Am. Banana*, 362 F.3d at 43. The Second Circuit held in *American Banana* that it makes no difference if agreements to longer payment periods were made before or after a default, *id.* at 45, or whether they were oral or in writing, *id.* at 46-47.

## C. Preliminary Injunctions Involving PACA Trusts

The usual standard for preliminary injunctions applies to "applications based upon the duties of a statutory trustee" under PACA. *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990): the applicant "must make an appropriate showing with regard to the merits of the litigation, [and] also must show the likelihood of irreparable injury if the requested relief is not granted." *Id.*

---

[3] "Instead of prescribing a specific period of time in the statute that will satisfy this requirement, Congress left the definition of prompt payment to the regulatory discretion of the Secretary of the USDA." *Am. Banana*, 362 F.3d at 42.

6

A risk that a PACA trustee will dissipate the trust constitutes irreparable harm. *See Tanimura & Antle, Inc. v. Packed Fresh Produce, Inc.*, 222 F.3d 132, 139 (3d Cir. 2000) (finding irreparable harm where there is a risk of trust dissipation and debtor is financially unstable); *Sage Fruit Co. v. Michail Nash Corp.*, No. 07-CV-4204 (CPS), 2007 WL 3226639 at *3 (E.D.N.Y. Oct. 29, 2007) (finding irreparable harm where there was evidence that debtor did not have sufficient funds to pay plaintiff, debtor might shut down, and debtor "needed to pay other vendors before plaintiff"). Regulations pursuant to PACA define "dissipation" as "any act or failure to act which could result in the diversion of trust assets or which could prejudice or impair the ability of unpaid suppliers, sellers, or agents to recover money owed in connection with produce transactions." 7 C.F.R. § 46.46(a)(2).

## III

### A. Dublin's Likelihood of Success on the Merits

Chloe has not carried its burden of showing that there was an agreement altering the payment period for the monies Chloe owed Dublin. As previously stated, the Court has found that the agreement reached at the May meeting was that Chloe would pay for new shipments immediately and that the then-existing debt would be paid down as soon as Chloe was able to do so. Chloe's attempt to depict the May agreement as an agreement to a longer payment period is implausible, and does not adequately appreciate the position that a seller-creditor is in when trying to ensure payment by a delinquent debtor. At the meeting, Schwartz demanded payment, and Chloe represented that it would pay when it was able. Schwartz is in exactly the situation that PACA is designed to protect sellers from;

7

to characterize his efforts to secure payment as a waiver of PACA trust protection would be to inhibit the statutory mechanism from serving the ends Congress intended it serve.

Therefore, a PACA trust attaches to the approximately $600,000 worth of unpaid shipments that Dublin made before the May meeting. Dublin is also the beneficiary of a PACA trust covering the proceeds of shipments since that meeting. The total amount of the PACA trust is the price of all the unpaid-for produce that Dublin has delivered to Chloe. The parties do not dispute that the amount in question is approximately $1.2 million.

## B. Irreparable Injury to Dublin

The existence of a PACA trust is not, in itself, sufficient to warrant injunctive relief.[4] A separate showing of irreparable harm is necessary. Because of the requirement that a PACA trustee "maintain trust assets in a manner that such assets are freely available to satisfy outstanding obligations to sellers," 7 C.F.R. § 46.46(d)(1), the use of trust assets for any purpose other than paying the beneficiary constitutes dissipation. The parties do not dispute that Chloe owes Dublin approximately $1.2 million for produce shipments and that Chloe does not have sufficient assets on hand to satisfy the debt. Since even payment for everyday business expenditures constitutes dissipation, *Morris Okun*, 814 F. Supp. at 348, it is clear that there is a risk that Chloe will dissipate the trust, which would leave Dublin "out of luck and out of money." *Horizon Mktg. v. Kingdom Int'l Ltd.*, 244 F. Supp. 2d 131, 140

---

[4] Regardless of whether a preliminary injunction issues, the existence of a PACA trust gives Dublin all the protections set out in the statute and associated regulations. Therefore, independent of the requirements imposed by the injunction issued here, Chloe is "required to maintain trust assets in a manner that such assets are freely available to satisfy outstanding obligations to" Dublin. 7 C.F.R. § 46.46(d)(1).

(E.D.N.Y. 2003). Therefore, Dublin has shown that there is a risk of irreparable injury if the requested relief is not granted, *See JSG Trading Corp.*, 917 F.2d at 79, and relief is necessary to enforce the trust.

## CONCLUSION

The Court grants Dublin's preliminary injunction application. Chloe is enjoined from removing, withdrawing, transferring, assigning or selling to any other person or entity the proceeds from sales of any or all existing or future inventories of food procured from Dublin, including, but not limited to inventory on hand, perishable agricultural commodities, or other products derived from perishable agricultural commodities, or receipts of payments for such commodities sold prior to the date of this order. Chloe is further enjoined from taking any other action which dissipates Dublin's beneficial interests in the approximately $1.2 million in PACA trust assets.

**SO ORDERED.**

s/ FB

FREDERIC BLOCK
Senior United States District Judge

Dated: Brooklyn, New York
November 19, 2008